IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| WILLIAM J. BENJAMIN KOOPMAN, ) <br> ) <br> *Plaintiff*, ) <br> v. ) <br> ) <br> NAVEEN SHAH, *et al.*, ) <br> ) <br> *Defendants*. ) <br> ) | Case No. 1:19-cv-0959 <br> Hon. Liam O'Grady |

## MEMORANDUM OPINION AND ORDER

Before the Court are the Parties' cross-motions for summary judgment (Dkts. 83, 86). For the reasons stated below, the Court **GRANTS** Mr. Koopman's motion summary judgment (Dkt. 83), and **GRANTS IN PART** Defendants' motion for summary judgment (Dkt. 86).

## BACKGROUND

This dispute stems from a failed attempt to implement a hotel management business. Plaintiff Ben Koopman is a career hotel management executive. Dkt. 84, at 3, ¶ 1. Defendant Naveen Shah is the President and CEO of Defendant Navika Group of Companies LLC ("Navika"). *Id.* ¶ 5. Navika is a holding company that "owns and manages real estate across the United States, including a portfolio of full and limited-service hotels." *Id.*

Mr. Shah and Navika first worked with Mr. Koopman in or about 2010, when Mr. Koopman managed several of Navika's hotels as Vice President of Operations for a third-party entity, Jackson Hospitality Services. Dkt. 87-2, at 133. This relationship was short-lived; Mr. Shah and Navika fired Mr. Koopman and his company for a "lack of competence." *See id.* at 132–33.

Curiously, the Parties stayed in touch. In June 2017, they reunited at a hotel management conference at New York University. *Id.* at 134–36. There, they met to discuss Mr. Koopman's "qualifications and experience . . . since [Navika] fired [him]," and to explore potential partnership opportunities. *Id.* at 136. Ultimately, they devised a plan to establish an entity "devoted to managing, not owning, hotel properties." Dkt. 87, at 8, ¶¶ 7–9. They had several telephone conversations and meetings in the subsequent months, and "began to correspond in earnest about how to potentially structure the new management company" in late Fall 2017. *Id.* at 9, ¶ 10. This all culminated in the Parties ratifying a "Non-Binding Letter of Intent" ("LOI") on December 28, 2017, which memorialized their "expression of interest" in the venture. *Id.* ¶ 11. The LOI proposed, *inter alia*, a business plan, distribution of ownership, financing, terms of profit allocation, business development targets, and a mission statement. *See generally* Dkt. 87-2, at 143–48. It also defined Mr. Koopman's anticipated stake in the venture as 20%, *id.* at 144, and set his expected compensation as President of the yet-to-be-formed entity, *id.* at 147. Immediately after the Parties ratified the LOI, Navika directed its paralegal, Randy Mondesir, to "file the papers with the state" to form the contemplated entity, "Flex Point Hospitality Services, LLC" (hereinafter "Flex Point").

Following ratification of the LOI, Mr. Koopman had his attorney, Michael Kosmas, draft an operating agreement for Flex Point that mirrored the terms of the LOI. *See id.* at 66. Kosmas sent this operating agreement to Navika, but Navika never signed it. *See* Dkt. 87-2, at 203. Mr. Koopman testifies that Mr. Shah assured him at the time that no operating agreement was necessary; that the Parties had their agreement, that they were moving forward in good faith, and that Mr. Shah's "word was his bond." Dkt. 87-2, at 70.

Mr. Koopman got to work building Flex Point. During the first four months of 2018, he

hired employees and negotiated leases and other contracts for the entity. Dkt. 87, at 11, ¶¶ 31–32. He received no compensation for this work.

Around the same time, Navika performed due diligence on Mr. Koopman. Upon request, Mr. Koopman sent Navika his resume, which contained false information stating that he had graduated with a bachelor's degree in hotel management from the University of Alabama in 1995, and that he was currently employed as the President of Donohoe Corporation's Hospitality Services Division. Dkt. 84-1, at 16–18. In fact, Mr. Koopman had dropped out of the University of Alabama during his senior year for personal reasons, and had resigned from Donohoe in May 2017 in lieu of termination. *See* Dkt. 84-1, at 3; Dkt. 87-2, at 114. When Navika asked for clarification on Mr. Koopman's employment status, he immediately disclosed that he stepped down from his role at Donohoe in May 2017. Mr. Koopman also offered Navika contact information for two high-level executives at Donohoe to facilitate a reference check. Dkt. 84-1, at 20. Navika followed up, Dkt. 93, at 13, but uncovered nothing that discouraged it from continuing its partnership with Mr. Koopman, *see* Dkt. 84, at 14.

Development of Flex Point continued throughout 2018. Navika provided all working capital. However, despite substantial investment, Flex Point was not generating income. *See* Dkt. 87, at 12, ¶ 34. Several key clients failed to materialize, *id.* at 10–11, ¶¶ 25–30, including several that belonged to Mr. Koopman, *id.* at 12, ¶¶ 35–37.

During October 2018, Mr. Koopman followed up with Navika about the status of the operating agreement he had proposed earlier that year. *Id.* at 12, ¶ 39. Navika responded by disavowing Mr. Koopman's proposal, citing uncertainty with respect to his job performance. *See id.* at 12–13, ¶¶ 40–42. However, Navika did not propose its own operating agreement. This became problematic in December 2018, when a business opportunity with Marriott Hotels

emerged. *Id.* ¶ 43. Marriott expressed interest in transferring its management contracts to Flex Point. However, Marriott refused to move forward with negotiations until Flex Point provided it with a valid operating agreement. *Id.* ¶ 44. This situation prompted Navika to draft and circulate its own operating agreement for Flex Point which identified Navika as its sole member and 100% owner. *Id.* ¶ 45. Mr. Koopman objected to the contents of the operating agreement but allowed it to be sent to Marriott based on the time-sensitivity of the business opportunity. *See id.* ¶¶ 46–48.

With Mr. Koopman's ownership stake in Flex Point potentially divested for good, Navika "undertook efforts to formalize [its] employment relationship" with him by preparing an employment agreement dated January 11, 2019. *Id.* ¶ 49. This agreement classified Mr. Koopman as an "at-will employee." *Id.* at 14, ¶ 50. Mr. Koopman again objected to this agreement but was told by Mr. Shah that he would not be paid if he did not sign it. Dkt. 89, at 8. Mr. Shah went so far as to "put a stop on Mr. Koopman's paycheck . . . ." *Id.* Mr. Koopman acquiesced and signed the agreement. Dkt. 87, at 14, ¶ 51.

On February 4, 2019, Navika called Mr. Koopman to tell him that it was "going in a different direction" and shuttering Flex Point. Dkt. 89, at 9. Mr. Koopman, resisting this move, suggested that Navika provide additional seed money to boost the business. Navika rejected Mr. Koopman's proposal outright. Dkt. 87-2, at 231. A week later, Navika fired Koopman. Dkt. 87, at 14, ¶ 56. It then "shuttered" Flex Point and converted all of Flex Point's assets to a new entity, Blue Sky Hospitality.

Mr. Koopman sued Navika and Mr. Shah on July 24, 2019. Dkt. 1. The Court denied Defendants' motion to dismiss on September 4, 2019. Dkt. 16. Defendants then filed an operative answer on April 2, 2020, and Defendant Navika asserted a counterclaim. Dkt. 53. The

Court denied Mr. Koopman's motion to dismiss Navika's counterclaim. Dkt. 62. Discovery ensued, and the Parties filed cross-motions for summary judgment. *See* Dkts. 83, 86. The motions are now fully briefed and ripe for review.

## LEGAL STANDARD

Summary judgment will be granted where, viewing the facts in a light most favorable to the non-moving party, there remains no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Marlow v. Chesterfield Cty. Sch. Bd.*, 749 F. Supp. 2d 417, 426 (E.D. Va. 2010). A party opposing a motion for summary judgment must respond with specific facts, supported by proper documentary evidence, showing that a genuine dispute of material fact exists and that summary judgment should not be granted in favor of the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). As the Supreme Court has held, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003) (quoting *Anderson*, 447 U.S. at 247–48) (emphasis in original). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015).

## DISCUSSION

### A. Defendants' motion for summary judgment

#### i. Defendant Shah's liability in his personal capacity

At the outset, the Parties disagree over whether Defendant Shah may be held liable in his personal capacity for his role in the dispute. Mr. Koopman has presented no evidence that Navika was Mr. Shah's alter ego, such that veil-piercing is warranted. Dkt. 95, at 5 n.2; Dkt. 89,

5

at 10–11; *see Barnett v. Kite*, 624 S.E.2d 52, 55 (Va. 2006). Thus, Mr. Koopman's claims against Mr. Shah in his individual capacity must fail unless Mr. Koopman can marshal evidence that Mr. Shah was not acting as an Navika's agent. Dkt. 89, at 10–11. This he cannot do. All key agreements were signed on behalf of Navika, by Mr. Shah or Navika COO David Fincannon. *See, e.g.*, Dkt. 87-2, at 148; *id.* at 228. Courtship of Mr. Koopman's partnership was conducted on behalf of Navika. *Id.* at 143 ("Navika Group of Companies LLC . . . is seriously interested in the formation of a hospitality management company with you being the President[.]"). Mr. Koopman's vetting process ran through Navika. Dkt. 87-2, at 44. And during many of the earliest relevant contacts between Mr. Shah and Mr. Koopman, Mr. Shah made clear he was acting as an agent for Navika. *See* Dkt. 87-2, at 141 ("Proposed assumptions[:] Initial investment is all by Navika and will have first rights of distribution to recover the investment before we can make distribution of profits"); *see also id.* at 140 ("Existing team (if qualified) stay in place[;] Accounting, legal, cash management team remains as is[;] NY office remains as is with the scope of work as part of the management team[;] Atlanta office-need to be visited after interview of their team[.]"). Mr. Koopman does not challenge Mr. Shah's assertion that he disclosed Navika as his principal. *See* Dkt. 1-1, at 6, ¶¶ 9–10. Thus, dismissal of Mr. Shah from this suit in his personal capacity is proper.

### ii. Counts I and II (Breach of Contract and Joint Venture Agreement)

The resolution of Counts I and II turns on whether (1) the Parties' December 28, 2017 LOI is binding and, (2) if not, whether a joint venture was formed regardless.

The first inquiry must be answered in the negative. Under Virginia law, "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff

caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004). A written document gives rise to a "legally enforceable obligation" only through words contained in its four corners. *Squire v. Va. Hous. Dev. Auth.*, 758 S.E.2d 55, 60 (2014) (cleaned up).

Count II centers on the Defendants' material breach of "the LOI committing them to consummate the creation and operation of a hotel management company, which came to be known as Flex Point." Dkt. 1-1, at 15, ¶¶ 51–52. But, the LOI is comprised of archetypical "agreements to agree in the future" that are unenforceable at law. *W.J. Schafer Assoc., Inc. v. Cordant, Inc.*, 493 S.E.2d 512, 515 (Va. 1997). The document itself is titled "NON-BINDING LETTER OF INTENT." Dkt. 84-2, at 2; *see also* Dkt. 89-4, at 24 ("Good Morning [Mr. Koopman], Please find the fully executed *Non-Binding Letter of Intent* attached.") (emphasis added). The first paragraph in the LOI states that "Navika . . . is *seriously interested in the formation* of a hospitality management company." Dkt. 84-2, at 2 (emphasis added). The document's provisions are aspirational, not concrete or definite. *Id.* ("Our mission at Management Co. (management company name *is to be decided*) *is to be* an industry leading hotel management company that provides boundless opportunities for our team members . . . .") (emphasis added). Finally, the ownership structure of the envisioned entity is left open-ended by the LOI's text, *id.* at 3 (Ownership: . . . TBD . . . 30%), as is entity's source of funding, *id.* ("Funding of Management co: Either (1) a loan from Navika up to $500,000, or (2) each member of the management company contributes capital in proportion to their ownership interests in the Management Co."). All this suggests that the Parties did not collectively "intend [their] negotiations to amount to an agreement which is binding." *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 939 F. Supp. 2d 572, 580 (E.D. Va. 2013), *aff'd*, 549 Fed. App'x. 211 (4th Cir. 2014). The LOI is simply too indefinite in its terms. *Smith v. Farrell*, 98 S.E.2d 3, 7 (Va. 1957).

No breach of contract can be based on it. *Allen v. Aetna Cas. & Sur. Co.*, 281 S.E.2d 818, 820 (Va. 1981).

Though the LOI is non-binding, there is ample evidence to support the existence of an implied joint venture agreement. To establish a joint venture, Virginia law requires a Plaintiff to demonstrate that "two or more persons jointly undert[ook] a specific business enterprise for profit, with each to share in the profits or losses and each to have a voice in the control and management." *Ortiz v. Barrett*, 278 S.E.2d 833, 840 (Va. 1981); *see also Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 539 (4th Cir. 1988) (citing *Ortiz*, 278 S.E.2d at 840). A joint venture may be formed notwithstanding the absence of a binding written contract. *See Snead v. Burke*, 1987 WL 488730, at *3 (Va. Cir. Ct. 1987) ("The evidence presented to the court was sufficient to show that the absence of a written agreement did not affect the existence of a joint venture. The parties' course of conduct, as well as their testimony as to the operation of the enterprise, permits no other conclusion."); *see also Meridian Title Ins. Co. v. Lilly Homes, Inc.*, 934 F.2d 319 (4th Cir. 1991).

Here, the record indicates that an implied joint venture was formed between Mr. Koopman and Navika. Navika's initial "assumptions," which were communicated prior to ratification of the non-binding LOI, proposed Mr. Koopman's entitlement to 15% of profits generated from the venture. Dkt. 87-2, at 141. The Parties' non-binding LOI, signed in December 2017, *see* Dkt. 87-3, at 3, ¶¶ 8–9, suggested that Mr. Koopman would receive a 20% ownership stake in the venture and receive profit distributions on surplus profits, *see* Dkt. 87-2, at 144–45. Around the same time, Mr. Shah told a would-be business partner, Bharat Patel, that Navika and Mr. Koopman were "setting up the management company to manage *their* hotels." *Id.* at 165 (emphasis added). Flex Point's LLC formation document, though not defining Mr. Koopman as a "member," Dkt. 87-2, at 217, granted Mr. Koopman an entitlement to "twenty

8

percent (20%) of any surplus cash flow of the Company," *id.* at 214. The same goes for Flex Point's operating agreement, which was drafted by Navika in late 2018. *See also id.* at 84. Mr. Shah, on deposition, admits, *inter alia*, that Mr. Koopman "had [an] interest in sharing the profits" of the joint venture, Dkt. 84-3, at 7, and concedes that he was considering the appropriate equity interest to grant Mr. Koopman for his work during Flex Point's nascency, *id.* Finally, the Parties agree that Mr. Koopman worked autonomously without compensation for at least four months in furtherance of the joint venture's interests, accruing "sweat equity." *See* Dkt. 87-2, at 73 ("Q: What risks, what financial or operational risks did you take . . . ? Mr. Koopman: [I] Didn't draw a salary from the time that I . . . start[ed] working in earnest in this. You know, the value of my time, the value of – you know, I put everything into it"); Dkt. 84-1, at 23–63 (attaching a lease negotiated by Mr. Koopman in February 2018); Dkt. 87-3, at 3, ¶ 14 (Mr. Shah acknowledging that Mr. Koopman was not paid until April 2018). Navika's contention that no joint venture existed is not supported by the record.

Resisting this outcome, Navika insists that Mr. Koopman, by signing an employment agreement with Flex Point on January 11, 2019, waived any argument that the JV agreement between the Parties was breached. *See* Dkt. 87, at 25 ("As noted above, Count I asserts that 'Defendants' breached the purported JV Agreement by terminating Mr. Koopman's employment. Mr. Koopman, however, expressly waived any such argument by signing the January 11, 2019 agreement naming him as President of Flex Point Hospitality Solutions, LLC."). This position is unsustainable at this juncture for two reasons.

First, unlawfully withholding compensation to extract an agreement to terms is not "merely exercising economic pressure." Dkt. 87, at 25–26 (citing *Goode v. Burke Town Plaza, Inc.*, 436 S.E.2d 450, 452 (Va. 1993)). On summary judgment, courts in this Circuit have made

this recognition. *See Todd v. Blue Ridge Legal Servs., Inc.*, 2001 WL 1841730, at *3 (W.D. Va. July 3, 2001), *report and recommendation adopted sub nom. Mizzi Todd v. Blue Ridge Legal Servs., Inc.*, 2001 WL 940894 (W.D. Va. Aug. 17, 2001) ("Plaintiff further offers that Whitfield also threatened to take away her annual leave and to withhold her last paycheck unless she signed the Agreement under circumstances a trier of fact could conclude amounted to duress on Whitfield's part."). Other authorities accord. *See* 28 R. Lord Williston on Contracts § 71:42 (4th ed. May 2021 Update) (collecting cases) ("A threat to breach a contract or to withhold payment of an admitted debt may constitute the wrongful act required for economic duress. Thus, a threatened breach constitutes duress where the failure to receive the promised performance will result in irreparable injury . . . ."). Whether Mr. Koopman signed the January 11, 2019 employment agreement under duress presents an issue for the trier of fact that is not appropriate for disposition on summary judgment.

Second, even if the employment agreement Mr. Koopman signed was valid, and even if he waived his right to future earnings as President of Flex Point, *see* Dkt. 87, at 24–25, his stake in the joint venture would remain intact. *Contra* Dkt. 87, at 25–26. Nothing in the agreement addresses Mr. Koopman's profit sharing or ownership interests in Flex Point. *See* Dkt. 87-2, at 225–28. The Virginia Supreme Court has recognized that joint ventures may "operate in the absence of specific provisions in [a] contract, or sometimes in conjunction with such provisions." *Legum Furniture Corp. v. Levine*, 232 S.E.2d 782, 785–86 (Va. 1977). Absent a direct conflict between the employment agreement and Mr. Koopman's stake in the joint venture, there is little reason to think one would affect the other.

Finally, as a last line of defense, Navika insists that Mr. Koopman has failed to "establish damages with reasonable certainty." Dkt. 84, at 28 (citing *Isle of Wight Cty. v. Nogiec*, 704

S.E.2d 83, 85 (Va. 2011)). The Court agrees that Mr. Koopman cannot prove losses from Navika's forced divestiture of his ownership stake in Flex Point with absolute certainty. But absolute certainty is not required at this stage. Mr. Koopman's expert offers an adequate and reliable opinion of the value of Mr. Koopman's forward-looking interest in the Parties' now-defunct venture based on the discounted cash flow method.[1] This opinion, paired with other facts and circumstances in evidence, is "sufficient to permit an intelligent and probable estimate of the amount of damage or loss sustained."[2] *See* Dkt. 87, at 29 (citing *E.I. DuPont deNemours & Co. v. Universal Moulded Prods. Corp.*, 62 S.E.2d 233, 254 (Va. 1950)). The Court will not freeze in time the damages inquiry based on Navika's repudiation of the non-binding LOI. *Contra* Dkt. 87, at 29–30. Nor will it freeze in time the assessment of damages based on Navika's termination of Mr. Koopman's employment in February 2019. As discussed, that personnel decision would not have impacted Mr. Koopman's putative joint venture stake.

### iii. Count III (Fraud in the Inducement)

To demonstrate fraud in the inducement, Mr. Koopman must show that Navika made misrepresentations that were positive statements of fact, made for the purpose of procuring Mr. Koopman's assent to or performance of a contract; that the misrepresentations made were material; and that Mr. Koopman relied upon the statements such that they induced him to undertake performance. *See Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 452 (E.D. Va. 2009).

There exists evidence of intentional material misstatements of fact made by Mr. Shah following the Parties' ratification of the non-binding LOI that induced Mr. Koopman to commit

---

[1] Assuming the Parties' 2019 employment agreement is valid, Koopman's claim for damages stemming from the loss of his employment as President of Flex Point would be purely speculative, as he would be an "at-will" employee.

[2] Navika may test its minority stakeholder discount theory on cross examination at trial.

11

his time and energy to the joint venture. When Mr. Koopman sent Navika a formal operating agreement in January 2018 for ratification that mirrored the terms of the Parties' non-binding LOI, Mr. Shah balked, minimizing the importance of a written agreement. As Mr. Koopman recalls:

> I presented [the operating agreement] as we agreed that we were doing. [Mr. Shah] pushed back on it. Said, 'you know, this makes my head crazy.' You know, he talked about how his eyes hurt. He doesn't like legal documents. It was such a long document. *That we were good, we had our agreement, we were moving forward in good faith, we didn't need this agreement, it doesn't stop us from doing what we're doing. My word is my bond. You know – if you need an operating agreement, then you don't trust me.*

Dkt. 87-2, at 70 (emphasis added). Thereafter, Mr. Koopman worked without compensation for the four months to advance the joint venture's interests. Then, toward the end of 2018, after his effort had been expended, Navika's legal counsel communicated to Mr. Koopman that Navika was not "good" with the terms of Mr. Koopman's proposed operating agreement:

> Good afternoon, Ben . . . We note that the attached draft operating agreement [from January 2018] has not been reviewed and or agreed to by Naveen or by Navika, neither verbally nor in writing, and as such is in all respects subject to Navika's review and approval prior to any part of it becoming effective which review will be addressed at such time when, in Navika's discretion, it becomes necessary.

*See id.* at 203. When a pressing need for a formal operating agreement did arise, Navika proposed its own operating agreement that conflicted with the operating agreement proposed by Mr. Koopman. *See id.* at 221–23. A reasonable jury could therefore find that Navika, by and through Mr. Shah as its agent, fraudulently induced Mr. Koopman to enter the joint venture by giving assurances about the operating agreement that it never intended to keep. *See SuperValu, Inc. v. Johnson*, 666 S.E.2d 335, 342 (Va. 2008) ("[I]f a defendant makes a promise that, when made, he has no intention of performing, that promise is considered a misrepresentation of present fact and may form the basis for a claim of actual fraud."); *see also Evaluation Rsch. Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994) (citing *Jefferson Standard Life Ins. Co. v.*

*Hedrick*, 27 S.E.2d 198, 202 (Va. 1943)). Summary judgment must be denied as to Count III.

\* \* \*

Defendants' motion for summary judgment is granted as to Count II but denied as to Defendant Navika on Counts I and III.

## B. Mr. Koopman's motion for summary judgment on Navika's counterclaims

### i. Fraud in the Inducement (Count I)

Navika counterclaims that Mr. Koopman fraudulently induced Navika to enter the implied joint venture agreement by "knowingly and intentionally represent[ing] to Navika that he had the required expertise and credentials to operate a hotel management company." Dkt. 53, at 19, ¶ 37. Navika focuses on two allegedly fraudulent misrepresentations made by Mr. Koopman: (1) that he "earned a bachelor's degree in Hotel and Restaurant Administration from the University of Alabama, Tuscaloosa in 1994," and (2) that he was the President of [Donohoe]" at the time the Parties initially undertook efforts to form the Joint Venture. *Id.* at ¶¶ 37–41.

As a reminder, to prove fraudulent inducement, Navika must show "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Winn v. Aleda Const. Co.*, 315 S.E.2d 193, 195 (Va. 1984); *see also Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 876 F. Supp. 2d 672, 681 n.7 (E.D. Va. 2012) ("The elements of actual fraud and fraudulent inducement are effectively the same."); *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 2012 WL 3841416, at \*6 (E.D. Va. Sept. 4, 2012) (same); *Marcano v. Fox Motors, Inc.*, 2011 WL 1326999, at \*3 (E.D. Va. Apr. 7, 2011) (same). In Virginia, reliance on a material misrepresentation must be reasonable. *See Masche v. Nichols*, 51 S.E.2d 144, 148 (Va. 1949); *White v. Potocska*, 589 F. Supp. 2d 631, 650 n.18 (E.D. Va. 2008) (internal quotations and

13

citations omitted) ("While the majority of states require only justifiable reliance, Virginia is one of the minority of states that requires the higher standard of reasonable reliance to establish fraud.").

Mr. Koopman undoubtedly misrepresented his educational credentials on the resume he provided to Navika during the initial stages of the joint venture's formation: "his resume incorrectly indicate[d] that he received a Bachelor of Science in Hotel & Restaurant Administration from the University of Alabama" in 1994. Dkt. 84, at 15. But the record also reveals scant evidence that this misrepresentation induced Navika to work with Mr. Koopman. Navika does show that it discussed Mr. Koopman's educational background with him prior to the joint venture's formation. *See* Dkt. 87-2, at 137 ("Q: Did – did you discuss [Mr. Koopman's] educational background? Mr. Shah: Most definitely, always. I don't talk anything unless I discuss education background. Yes, I did.").[3] But Mr. Shah also testifies on deposition that he worked with Mr. Koopman around 2010. Dkt. 87-2, at 132–33. During this period, Mr. Shah "fired [Mr. Koopman] and his company" for "lack of competence," because Mr. Koopman "did not know his job." *Id.* Mr. Shah explains that he and Navika only reengaged Mr. Koopman in 2017 after Mr. Koopman assured Mr. Shah that his experience and qualifications had improved in the interim years. *See id.* at 134 ("Mr. Shah: Well, he was in contact with me all these years, and he was trying to express his *experience and qualifications which allegedly improved from the time I had to fire him*, so he – he represented himself to be a seasoned, you know, hospitality executive and that's how we resumed that conversation.") (emphasis added); *id.* at 136 ("Q: Do you remember anything about your meeting [with Mr. Koopman] at the NYU conference [in

---

[3] This discussion just as likely covered Koopman's Certified Hotel Administration designation from the American Hotel & Lodging Educational Institute and the IHG Owner's Association Leadership Institute at Emory University. Dkt. 84, at 3. There is no indication that Navika relied specifically on Koopman's putative bachelor's degree when deciding to work with him.

14

mid-2017]? Mr. Shah: No. All I can think of is at the end, I must have told him that, 'Let's – let's have the dialogue more about your qualifications and experience, what you deemed it, in last *six or seven or eight years since the time I fired you and your firm and see what – what business opportunities can we – can we talk about it*.") (emphasis added). Navika claims it "relied on Koopman's misrepresentations regarding his expertise and credentials to successfully manage Flex Point," but Mr. Koopman's bachelor's degree could not have been part of this calculus. No actionable fraud claim lies based on this misrepresentation

Navika's claim based on Mr. Koopman's purported lies about his work history likewise fails, albeit for lack of *reasonable* reliance. *See Masche*, 51 S.E.2d at 148.

Mr. Koopman resigned his position with his prior employer, Donohoe, on May 5, 2017, even though Donohoe Human Resources staff testified that this resignation was "in lieu of termination." Dkt. 87-2, at 114. Mr. Koopman continued to support Donohoe" as a "mentor and a friend" after his resignation, assisting with the new president's onboarding. *Id.* at 42. Months later, shortly after the Parties signed the non-binding LOI, Mr. Koopman sent a resume to Navika that incorrectly listed his employment status with Donohoe as ranging from "2015 [to] present" with a note that the resume "need[ed] to be updated with recent performance metrics and results." *Id.* at 46. There is some dispute over what Navika knew about Mr. Koopman's employment, and when it gleaned this information. Mr. Shah attests that Mr. Koopman told him in June 2017 "that he *has been working* as a president of Donohoe Hospitality based out of Washington" and was "doing great." *Id.* at 136 (emphasis add). Mr. Shah adds that Koopman claimed to be employed by Donohoe in September 2017 during a meeting they had in Mount Laurel, New Jersey. Dkt. 84-3, at 3. Mr. Koopman disagrees with Mr. Shah's testimony. Dkt. 87-2, at 50 ("Mr. Koopman: [Mr. Shah] knew I wasn't working with Donohoe anymore as

15

president. Q: Did you tell him that? Mr. Koopman: Oh, absolutely. I told him that in June [2017]. Q: And do you recall . . . Mr. Koopman: At the NYU hotel conference. Q: That you were no longer working with Donohoe? Mr. Koopman: That's correct."). Ultimately this factual dispute is not consequential.

For one, Mr. Koopman's putative misrepresentation was not material. Navika trumpets materiality, insisting that unemployment "suggests (correctly, in this case) that the job seeker was fired."[4] Dkt. 93, at 12–13; *see also id.* at 9 (emphasizing the materiality of Mr. Koopman's employment status). Yet, when Navika asked Mr. Koopman whether he was still employed at Donohoe during its vetting process in January 2018, Mr. Koopman immediately disclosed that he was not. Dkt. 84-1, at 20 ("Good morning, happy to provide clarification. I started as President in March 2015. I did step down in my capacity as President in May [2017] and helped select and transition with Thomas Penney through August."). Mr. Koopman then provided Navika with two different Donohoe contacts, along with their phone numbers and email addresses, to facilitate a reference check. *See id.* Navika performed this reference check and learned nothing that dissuaded it from moving forward with its partnership with Mr. Koopman. Dkt. 93, at 13; *see also* Dkt. 84, at 14 (indicating that Mr. Shah learned of Mr. Koopman's May 2017 end date with Donohoe and was undeterred).

Even if Mr. Koopman's misrepresentations about his work history were material, Navika did not reasonably rely on them. Navika knew, through Mr. Shah, that Mr. Koopman had a history of occupational incompetence, *see* Dkt. 87-2, at 132–33. Yet, Navika did not bother to inquire into Mr. Koopman's employment history and past job performance before teaming up

---

[4] Mr. Koopman was not fired; he resigned. Dkt. 87-2, at 114 ("Paragraph 10 [of Donohoe's Separation and General Release Agreement] provides . . . that Mr. Koopman will be considered to have voluntarily resigned effective May 5, 2017."); *see also* Dkt. 87, at 8, ¶ 3 ("Koopman resigned from his position at Donohoe, effective May 5, 2017.").

with him in the first instance. In Virginia, reliance on a misrepresentation must be reasonable to give rise to fraud, and "the touchstone of reasonableness is prudent investigation." *Elliott v. Great Point Partners, LLC*, 2011 WL 63657, at *5 (E.D. Va. Jan. 5, 2011) (citing *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999)). Mr. Shah's own testimony indicates that Navika failed to perform a "prudent investigation" by not diligently investigating Mr. Koopman's qualifications despite knowledge in its possession that should have aroused its suspicions. *See Elliott*, 2011 WL 63657, at *5 (citing *White*, 589 F. Supp. 2d at 652). Navika did not perform a reference check until January 2018. A prudent investigation would have occurred at a much earlier stage.[5]

### ii. Breach of Confidentiality and Enforcement of Guaranty (Counts II and III)

Navika also asserts breach-of-confidentiality and enforcement of guaranty causes of action based only on the LOI. Dkt. 53, at 21, ¶¶ 48–68. Unlike Counts I and IV in Navika's counterclaim, Counts II and III are expressly contingent on the LOI's enforceability. *Compare id.* at 19, ¶ 36 (Count I) ("Counter-Plaintiff Navika contends that the LOI, as indicated on the face of the document itself, is non-binding and unenforceable and that there is no alleged joint venture agreement. However, to the extent that the trier of fact finds that the LOI is enforceable

---

[5] Navika also offers a cobbled-together, concealment-like fraud claim, complaining that Mr. Koopman did not reveal the exact circumstances surrounding his departure from Donohoe. *See* Dkt. 93, at 8 ("[A] reasonable jury could conclude that Mr. Koopman lied about his post-May 5, 2017 employment status in order to conceal that his departure from Donohoe was involuntary."). But this claim likewise fails. Mr. Koopman was under no duty to disclose the exact circumstances of his departure from Donohoe, and never made any false representations of fact regarding his exit. The closest he came was noting that his departure with Donohoe was "on good terms." *See* Dkt. 84-1, at 20. This is, in fact, an expression of opinion. *See Mortarino v. Consultant Eng'g Servs.*, 467 S.E.2d 778, 781 (Va. 1996) ("It is well settled that a misrepresentation, the falsity of which will afford ground for an action for damages, must be of an existing fact, and not the mere expression of an opinion. The mere expression of an opinion, however strong and positive the language may be, is no fraud . . . .").

In any case, Mr. Shah unequivocally testified that he was not interested in the circumstances of Mr. Koopman's departure from Donohoe, undermining the materiality of this purported misrepresentation. *See* Dkt. 84, at 14 ("Q: So, the circumstances of Mr. Koopman's departure . . . from Donohoe were not of interest to you; correct? . . . Mr. Shah: I – it was not – yeah, it was not of interest to me . . . .").

17

*or that there is an implied joint venture agreement*, Counter-Plaintiff Navika, in the alternative, pleads fraudulent inducement by Koopman.") (emphasis added), *and id.* at 24, ¶ 70 (count IV) (Counter-Plaintiff Navika contends that there is no alleged implied joint venture agreement, as indicated by the "NON-BINDING LETTER OF INTENT" and the parties' course of conduct following the execution of the LOI. However, *to the extent that the trier of fact finds that there is a joint venture agreement between the parties*, Counter-Plaintiff Navika, in the alternative, pleads that Koopman failed in his obligations pursuant to the joint venture agreement and/or breached the joint venture agreement by Koopman.") (emphasis added), *with id.* at 21, ¶ 49 (Count II) (Counter-Plaintiff Navika contends that the LOI, as indicated on the face of the document itself, is non-binding and unenforceable and that there is no alleged joint venture agreement. However, *to the extent that the trier of fact finds that the LOI is enforceable*, Counter-Plaintiff Navika, in the alternative, pleads that Koopman failed in his obligations pursuant to the LOI / breach of the LOI by Koopman.") (emphasis added), *and id.* at 22, ¶ 57 (Count III) ("Counter-Plaintiff Navika contends that the LOI, as indicated on the face of the document itself, is non-binding and unenforceable and that there is no alleged joint venture agreement. However, *to the extent that the trier of fact finds that the LOI is enforceable*, Counter-Plaintiff Navika, in the alternative, pleads that Koopman failed in his obligations pursuant to the LOI / breach of the LOI by Koopman.") (emphasis added).

The LOI is unenforceable, so the court must dismiss Counts II and III in Navika's counterclaim.

### iii. Breach of the Joint Venture Agreement (Count IV)

Finally, Navika seeks recoupment of its financial investment in the implied joint venture because "Koopman failed in his obligations pursuant to the joint venture agreement and/or

breached the joint venture agreement by Koopman." Dkt. 53, at 24, ¶ 70. This position suffers from three fundamental flaws.

First, Navika's statement of law is contradicted by its own citation. It writes:

> "Under Virginia law, parties to a joint venture agreement share in the profits *and losses* of the business enterprise. *Ortiz v. Barrett*, 278 S.E.2d 833, 840 (Va. 1981) ("A joint venture is established by contract, express or implied, where two or more persons jointly undertake a specific business enterprise for profit, with each to share in the profits *or* losses and each to have a voice in the control and management.").

*Id.* ¶ 71 (first emphasis in original; second emphasis added). Navika says "and," even though *Ortiz* says "or." These words do not mean the same thing.

Second, building on its first misstep, Navika argues that profits and losses must be split evenly based on binding authority:

> "Virginia law is clear that, in the absence of a partnership agreement, the partners are to share equally in the profits and losses of the partnership. *See Legum Furniture Corp. v. Levine*, 232 S.E.2d 782, 786 (Va. 1977) ("It is the established rule in Virginia that *in the absence of an agreement, express or implied*, between partners in respect to their shares in the profits and losses of the business, they are to share equally.").

Dkt. 93, at 27 (emphasis added). But, Navika overlooks *Legum*'s limited application to joint ventures that are formed in the absence of an express or implied joint venture agreement. 278 S.E.2d at 840. Here, there is an implied joint venture agreement. For this reason, *Ortiz* applies and *Legum* does not. *Compare Ortiz*, 278 S.E.2d at 840, *with Legum*, 232 S.E.2d at 786 (emphasis added).

Third, viewing Navika's argument through the lens of *Ortiz*, no evidence entitles Navika to equitable indemnity for any losses suffered by Flex Point. Looking beyond the opacity of the value of Flex Point's assets that were converted to Blue Sky's possession in 2019, the Parties' draft agreements, communications, and business documents all suggest that Koopman was to be entitled to surplus profits from, and perhaps an ownership stake in, Flex Point. *See, e.g.*, Dkt. 87-2, at 84, 141, 144–45; Dkt. 87-3, at 3, ¶¶ 8–9. No evidence implies that Flex Point's losses

19

were to be allocated to Koopman. At most, a provision in the non-binding LOI concerns Koopman's obligation to guarantee repayment of a funding loan provided by Navika. Dkt. 87-2, at 144. Navika provided no loan; it simply invested working capital in labor and tangible and intangible assets later transferred to Flex Point's successor entity, Blue Sky. Navika's own filings make this clear. *See* Dkt. 87, at 12, ¶ 34 ("By late 2018, Navika had invested approximately $2.5 million in Flex Point. Koopman had not invested any capital.") (emphasis added); *see also* Dkt. 87-2, at 211 (Flex Point LLC Agreement) ("Surplus cash flow is defined as the cash available, if any, after the payment in full of: *(i) any loans given to the company; (ii), any capital invested by Navika Capital Group and its affiliates*; and, (iii), any capital invested by any member and any other third parties.") (emphasis added). The non-binding, contingent loan provision in the LOI cannot be strained to imply a blanket obligation on the part of Mr. Koopment to incur joint venture losses.

* * *

Mr. Koopman's motion for summary judgment is granted.

## CONCLUSION

For the reasons stated above, and for good cause shown, the Court **GRANTS** Mr. Koopman's motion summary judgment (Dkt. 83), and **GRANTS IN PART** Defendants' motion for summary judgment (Dkt. 86). Count II of Mr. Koopman's complaint is dismissed. Counts I and III will proceed as to Defendant Navika.

It is **SO ORDERED**.

June 25 2021
Alexandria, Virginia

Liam O'Grady
United States District Judge